NO: **785-15**

ORIGINAL

IN THE

COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 14 2015

Abel Acosta, Clerk

MARK BRANIGAN.

Petitioner.

vs.

THE STATE OF TEXAS.

Respondent.

On Petitioner For Discretionary Review
from the Second Court of Appeals. Fort Worth. Texas
No. 02-13-00490-CR

Mark Branigan
Clements Unit - 1887004
9601 Spur 591
Amarillo. TX 79107-9606
Pro se

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2015

Abel Acosta, Clerk

## TABLE OF CONTENTS

TABLE OF CONTENTS.............................................. i.

INDEX OF AUTHORITES........................................... ii.

STATEMENT REGARDING ORAL ARGUMENT............................. iii

STATEMENT OF THE CASE......................................... iii

STATEMENT OF PROCEDURAL HISTORY............................... iii

GROUNDS FOR REVIEW

GROUND ONE.................................................... 1.

GROUND TWO.................................................... 1.

ARGUMENT ONE.................................................. 1.

ARGUMENT TWO.................................................. 2.

PRAYER........................................................ 4.

APPENDIX

# INDEX OF AUTHORITIES

Cleveland v. State,
    177 S.W.3d 374 (Tex.App.-Houston [1st Dist.] 2005)........    1.

Jackson v. Virginia
    443 U.S. 307, 99 S.Ct. 2781 (1979).......................    1.

Moore v. State,
    278 S.W.3d 444(Tex.App.-Houston [14th Dist.] 2009)........    3

McDuff v. State,
    939 S.W.2d 607 (Tex.CrimApp. 1997).......................    1.

Zuliana v. State,
    97 S.W.3d 589 (Tex.Crim.App. 2003).......................    1.

## STATEMENT REGARDING ORAL ARGUMENT

Because Petitioner is proceeding pro se and the issues addressed are not complex in a legal nature, he waives and does not request oral argument.

## STATEMENT OF THE CASE

Petitioner is convicted by jury of the felony offense of murder from a contaminated crime scene and uncoorborated tesimony of various witnesses which resulted in a 40-year imprisonment in lieu of the evidence.

## STATEMENT OF PROCEDURAL HISTORY

On October 26. 2012. the state filed an indictment in which they allege that on or about August 2, 2012. in Tarrant County. Texas. the Petitioner intentionally caused the death of Danny Lafedge. by shooting him with a firearm. The indictment also allged a repeat offender paragraph.

Petitioner entered a plea of not guilty to the jury for guilt-innocence and presented the affirmative defense of self-defense to the murder charge. The jury found Petitioner guilty and found true the repeat offender enhancement and assessed punishment at 40-years imprisonment.

Petitioner made direct appeal to the Second Court of Appeals in Fort Worth. Texas and on June 4, 2015. the Court affirmed the murder conviction in an unpublished opinion. From said opinion Petitioner now seeks Discretionary Review.

iii.

## GROUNDS FOR REVIEW

ERROR FOR REVIEW ONE:

THE SECOND COURT OF APPEALS ERRED IN FINDING THAT THE EVIDENCE
WAS LEGALLY SUFFICIENT TO PROVE PETITIONER DID NOT SHOOT MR.
LAFEDGE IN SELF-DEFENSE.

ERROR FOR REVIEW TWO:

THE SECOND COURT OF APPEALS ERRED IN RULING THAT THE TRIAL COURT
DID NOT ABUSE IT'S DISCRETION IN DENYING THE MOTION FOR MISTRIAL
FOR PROSECUTOR'S UNFOUNDED STATEMENT ON SELF-DEFENSE.

ARGUMENT

ERROR FOR REVIEW ONE RESTATED:

THE SECOND COURT OF APPEALS ERRED IN FINDING THAT THE EVIDENCE
WAS LEGALLY SUFFICIENT TO PROVE PETITIONER DID NOT SHOOT MR.
LAFEDGE IN SELF-DEFENSE.

When evaluating a legal sufficiency claim, courts consider all

the evidence. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781,

2789 (1979); McDuff v. State, 939 S.W.2d 607, 614 (Tex.Crim.App.1997).

Self-defense is classified as a defesne as distinguished from an

affirmative defense. Zuliana v. State, 97 S.W.3d 589, 594 (Tex.Crim.

App. 2003). With a defense, the burdens at trial alternate between the

defesne and the State, with the defendant bearing the burden of produc-

tion of some evidence to support the particular defense and, once the

defendant has met that burden, the state bearing the burden of persuation

to disprove the raised defense. Id. In short, when a defendant raises

the issue of self-defense, the state, in order to convict him or murder,

first must prove the elements of the offense beyond a reasonable doubt

and then has to persuade the jury that the defendant did not act in

self-defense. Cleveland v. State, 177 S.W.3d 374, 379 (Tex.App.-Houston

[1st.Dist] 2005).

Page 1.

'The following facts were prsented to the jury which clearly, in relation to the evidence establishes that Petitioner acted in self-defense:

)( Petitioner was not hunting the victim;

)( Petitioner was attempting to return his apartment when the victim approached Petitioner in an agry manner;

)( The victim was attempting to retrieve a gun;

)( The victim was under the influence of marijuana, hyddrocodone, and an opiate derivative;

)( The victim had previously been extremely proud of his gun and even had a picture taken with it showing him throwing gang signs;

)( The victim sold drugs;

)( No witness ever saw Petitioner fire a gun;

)( No fingerprints of gun or shells we conducted;

)( There was a missing firearm from the crime sceene;

)( All the witness testimony contradicted each other;

)( Petitioner clearly was defending himself against being murdered himself.

Any rational trier fact could have easily determined that the Petitioner was only defending himself against being assaulted or murdered. I.d Jackson @ 319.

ERROR FOR REVIEW TWO RESTATED:

THE SECOND COURT OF APPEALS ERRED IN FINDING THAT THE TRIAL COURT DID NOT ABUSE IT'S DISCRETION IN DENYING THE MOTION FOR A MISTRAIL FOR PROSECUTOR"S UNFOUNDED STATEMENT UN SELF-DEFENSE.

In reviewing page 44 of the Appellate brief the statement made by the Prosecutor regarding Petitioner loading a gun was expounded upon and was clearly established that the statment about "loading a gun is not self-defnese in any form or fashion." The statement made by the prosecutor planted a poisoned seed in the minds of the jury that due to the fact that Petitioner admitted to loading a gun negates any theory of self-defense.

Appellat courts review a trial court's denial of a motion for mistrial as an abuse of discretion. Moore v. State, 278 S.W. 3d 444, 449 (Tex. App.-Houston [14th Dist]. 2009). Mistrial are appropriate only for highly prejudicial and incurable errors. Id. When determining whether a new trial nonetheless is mandated despite an instruction to disregard, the Appellate courts look at the facts and circumstances of the case to see if the trial court's instruction cured the presentation of objectionable matter before the Jury. Id. @ 450.

The trial court took the curative measure of instructing the jury to disregard the prosecutor's statement. However, the court's jury instruction was ineffective, the damage was already done to the jury in the effect they now believed that by loading a gun there is no way for self-defense. Id. Moore @ 45U. Because the evidence as clearly presented in error one was insufficient to support a conviction, the prosecutor needed to get the unlawful statement to the jury to secure a conviction and it worked.

## PRAYER

Wherefore, premises considered, Petitioner prays that the Honorable Court of Criminal Appeals grant review and after review of the errors presented herein, reverse the Second Court of Appeal's judgment of affirmation and Order the entry of an aquittal and or grant any and all other relief to which Petitioner is entitled.

Respectfully submitted,

Mark Branigan
Clements Unit - 188704
9601 Spur 591
Amarillo. TX 79107-9606
Pro se
August 24, 2015

## CERTIFICATE OF SERVICE

This is to certify that I have on this 24th day of August, 2015, placed a true and exact copy of this document in the U.S. Mail. postage pre paid addressed to:

Sharon A. Johnson.
Assistant District Attorney
Tim Curry Criminal Justice Center
401 W. Belknap
Fort Worth, TX 76196

## APPENDIX

Due to the fact that Petitioner is a pro se prisoner and without any type of access to a copy machine he is not able to supply a copy of the only Second Court of Appeal's June 4, 2015 opinion.



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00490-CR

MARK BRANIGAN                                                    APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1292313D

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Mark Branigan appeals his conviction for murder. In two issues, Branigan argues that the evidence is insufficient to support the jury's determination that he did not act in self-defense when he admittedly shot and killed Danny Lafedge and that the trial court erred by denying his motion for mistrial. We will affirm.

---

[1]See Tex. R. App. P. 47.4.

## II. BACKGROUND

Heather Goldsmith testified that around 3:00 a.m. on August 2, 2012, Brandon Jackson and his friends came by her apartment and stayed for a couple of hours. Later in the morning, Goldsmith and Lafedge, who was staying with her, discovered a loaded Hi-Point 9 millimeter handgun between the armrest and cushion of the sofa. By Goldsmith's account, Branigan then came by the apartment around 11:00 a.m. and Lafedge showed him the gun. Goldsmith said that while she was on the phone, Branigan took the gun without permission and left. Goldsmith stated that she called after him, repeatedly telling him to bring the gun back, but that Branigan ignored her demands.

Goldsmith said that she then got into her car and followed after Branigan, shouting at him to bring the gun back, but that he just walked away even faster. By Goldsmith's account, she then saw Branigan go into another apartment, so she parked her car in front of it. When Branigan came back out, Goldsmith testified that she again told him he needed to return the gun and that he told her he would return it later. Goldsmith said that she started to drive back to her apartment but that after talking with her boyfriend on the phone, she returned to the apartment she had seen Branigan enter, knocked on the door, and asked to speak with him. Branigan never came to the door, so Goldsmith drove back to her apartment, where she told Lafedge that Branigan had taken the gun. From there, according to Goldsmith, Lafedge went to retrieve it.

2

Steven Perry testified that on the same day, he was in the apartment of Megan and Melody Saltzman when he saw a car pull up in front with two people inside the car. They got out and started arguing. According to Perry, Branigan then went inside the apartment and the woman he had been arguing with drove off. Perry said that Branigan appeared "flustered" and "really, really upset" and that he was cursing about Lafedge. Perry said that the woman in the car returned and knocked on the apartment door, asking for Branigan. Perry said that he told her that he did not know who Branigan was and sent her away. Perry testified that he then saw Branigan pull a gun out of his waistband, load it, and wave the gun around. Branigan asked Perry to give him a ride to some nearby apartments, but Perry refused because he "did not want to be involved anymore with what was going on." Branigan left on foot.

As he watched Branigan from the apartment window, Perry said he saw Lafedge come across the parking lot, "walking very fast" toward Branigan. According to Perry, as Lafedge neared Branigan, Branigan pulled the gun from his waistband and shot him. Perry testified that Lafedge did not have a weapon. By Perry's account, Branigan shot Lafedge, then there was a pause, and then Perry "heard a couple more [shots] and [he] saw [Lafedge] go to the ground." Perry said that Lafedge fell behind a car, blocking his view of him, but he then saw Branigan point the gun toward the area where Lafedge had fallen and continue shooting. Perry said that Branigan then ran away, carrying the gun. Perry immediately ran outside, where he found Lafedge lying on the ground.

3

William Hendrix testified that he was also in the Saltzmans' apartment when Branigan showed up on August 2. Hendrix described Branigan as "pretty irrational" and said that he was "yelling, screaming about a guy being at his buddy's house selling his drugs and being around his wife." According to Hendrix, Branigan said he was going to "get that mother___." Hendrix said he then heard a gun's slide being pulled back, and looked over to see Branigan picking up a bullet that he apparently had just ejected from the chamber of the gun he was holding. Hendrix said that Branigan then loaded the bullet back into the gun's clip. Hendrix said that Branigan also asked him for a ride but that he refused "[b]ecause [he] knew [Branigan] had a gun on him."

When Branigan left, Hendrix also looked out the apartment's window and watched Branigan until he was out of sight. Hendrix testified that he then noticed a man walking across the parking lot and that although he could not make out the words, he heard Branigan "yelling and screaming" at the man. Hendrix said he heard four gunshots within short order. Hendrix averred that he then went outside, "peeked [his] head out around the corner," and saw Lafedge lying on the ground with Branigan standing over him declaring "I got you now, mother___." Hendrix said he heard Lafedge yell, "No," but Branigan continued to fire the gun "until it was empty," at which point Branigan then ran away. Hendrix also testified that Lafedge had no weapon.

After the shooting, Hendrix went to visit his sister, Danielle Rice, who lived in a neighboring apartment complex. To his surprise, he found Branigan inside

4

her apartment. Hendrix said that Branigan asked him, "Is [Lafedge] dead?" Hendrix asked Branigan to step outside. While outside, Hendrix said he asked Branigan if he still had the gun and Branigan replied that he had thrown it into "the creek." Hendrix said that he then left his sister's apartment, called his mother, and told her to get his sister out of the apartment. From there, Hendrix flagged down a police officer and told him about the shooting.

Zakarie Barksdale was also in the Saltzmans' apartment that day. Like the testimony of others, Barksdale described Branigan as "irritated, aggressive," and "definitely mad at someone about something." Barksdale said that Branigan was using profanity and that his comments were directed at Lafedge. According to Barksdale, the sound of Branigan dropping the gun's clip and ejecting a bullet attracted his attention toward the fact that Branigan was holding a gun. Barksdale recalled that after Goldsmith came to the apartment and was turned away, Branigan left. After hearing a gunshot, Barksdale said he "ran outside to see what was going on" and then heard "five more" shots. Once outside, he saw Lafedge lying on the ground with Branigan standing over him. Barksdale said he heard Branigan say, "I told you I was going to kill you." Like Perry and Hendrix, Barksdale testified that Lafedge did not have a weapon. According to Barksdale, after Hendrix had briefly pulled him back inside the apartment, he saw Branigan run by the patio door "with the gun in his hand," so he ran back outside to Lafedge and stayed by him as he died.

5

Rice testified that on August 2, she and her sister were outside Rice's apartment, watching their children play, when Branigan walked up and started a conversation. She said that she recognized Branigan from his previous visits to her neighbors. When Rice and her family went inside, Branigan accompanied them, asking for a drink of water. Once inside, according to Rice, Branigan then pulled out a "blunt" and offered to share it with them. Rice testified that as the three of them smoked, Branigan told them that he had just shot and killed someone. Rice said that Branigan also told them that no one saw him and the police could not prove that he had shot someone because he had discarded the gun. By Rice's account, Branigan said if he was questioned, he would say he was with Rice and her sister, and he asked them if they would be his alibi. Rice testified that Branigan "didn't really seem too like regretful" about shooting Lafedge. When he asked her sister for a number, Rice said she then realized he was serious about the shooting and his need for an alibi. Rice said that she then gave Branigan a candle and some home décor catalogs and told him that he could use them as proof that he was at her apartment during the time of the shooting.

Fort Worth Police Officer Andy Morquecho testified that when they located Branigan, he told officers, "I'm not going to run from y'all; I almost got shot myself at that apartment." Morquecho said that as he transported Branigan to the police station after arresting him for an unrelated charge, Branigan volunteered that he had discarded the gun used in Lafedge's murder. On cross-examination,

defense counsel asked Morquecho whether Branigan's statement that he had almost gotten shot was suggestive of self-defense. Morquecho replied, "In my opinion, no. And the reason why, he was very calm and collected. A person that I've noticed that had problems in the past or in a fight, they want to tell you their whole story and they're flustered, and -- and this was not the case." Morquecho testified that during his investigation of Lafedge's murder, he was unable to recover the weapon used to kill Lafedge.

Susan Roe, a forensic pathologist for the Tarrant County Medical Examiner's Office, testified that Lafedge had suffered four entry gunshot wounds: one to his left upper chest, one in the lower right side of his chest, one to the top of his foot, and one to the fourth finger of his left hand. According to Roe, Lafedge also had graze wounds on the fourth finger of his right hand and his left elbow. Roe said that the graze wounds might have been caused by the same bullets that struck Lafedge's body. Roe testified that as a result of the gunshot wounds, Lafedge suffered extensive injuries, including damage to his pulmonary artery, his left lung, and his liver. Roe estimated that Lafedge was struck by between four and six bullets. Roe said that Lafedge's injuries were not survivable.

Vicki Hall, a trace evidence examiner with the Tarrant County Medical Examiner's Office, testified that test results for gunshot residue on Branigan were inconclusive. The gunshot residue test on Lafedge's hands, however, revealed antimony, barium, and lead on the backs and palms of both his hands.

7

According to Hall, the residue on Lafedge's hands could have been deposited if he held his hands up while being shot at.

In its case-in-chief, the State offered a seventy-five minute excerpt of Branigan's recorded interview with Fort Worth Police Detective Danny Paine. In the interview, Branigan denied shooting Lafedge. Moreover, Branigan claimed to have witnessed another individual commit the murder. Branigan can be heard telling Paine a narrative wherein Lafedge was planning to trade a gun for marijuana and asked Branigan to go along to "watch [his] back." Branigan identified the individual Lafedge was allegedly planning the trade with as "G." According to Branigan's statement, he told Lafedge not to hand "G" a loaded gun. But, according to Branigan's story in the interview, Lafedge did give "G" a loaded weapon and received a "nice-sized package" of marijuana in return.

Branigan said that from there he saw the two men begin to exchange words and heard twelve to thirteen gun shots; he ran from the scene without "look[ing] back." Branigan can be heard saying that he met a girl named "Melissa" and told her that his friend got shot because his friend was stupid and gave someone a gun. But then Branigan can be heard contradicting a portion of his statement to Paine, saying he did not know Lafedge was going to trade the gun and that he just thought Lafedge was carrying it for protection. In the interview, Branigan insisted he did not shoot Lafedge.

After Branigan finished telling his story, Paine confronted Branigan with the fact that several witnesses had identified him as the shooter. Paine can be heard

8

telling Branigan that if Lafedge had done something to provoke or frighten him, or if he thought Lafedge was about to shoot him, he needed to tell Paine about it. Branigan responded, "I ain't fired no gun, man."

Shortly thereafter, Paine again told Branigan that he could understand Branigan shooting Lafedge if he thought he was about to get shot himself and that if something like that happened, they needed to talk about it. For the next fifteen minutes Paine continued to encourage Branigan to tell him whether he had acted in self-defense, assuring him that everyone understands that a person has the right to defend himself, and Branigan continued to deny shooting Lafedge.

The defense called Ellen Dexter, who testified that on August 2, she was lying on her couch when she heard two gunshots and went outside. Dexter said that she saw a man lying on the ground and saw a white woman and a black man standing nearby. Dexter testified that the woman was having a discussion with the man and that the woman was holding something that "looked like a gun." On cross-examination, however, Dexter said that her memory is sometimes fuzzy due to her medications, and she agreed that the item in the woman's hand could have been a cell phone.

Branigan testified at trial. He began his testimony by admitting to having a prior conviction for robbery in Illinois, where he stole a car at gunpoint, and a prior conviction for assault in Missouri, where he shot at a police officer.

9

Branigan testified that Lafedge had lived with him until three days prior to the shooting and that their living arrangements changed when Branigan's girlfriend found out that the two of them were selling marijuana out of the apartment. According to Branigan, his girlfriend told him they had to stop selling drugs from their apartment but when he told Lafedge, the two had a falling out because Lafedge did not believe Branigan's story and wanted to keep selling.

By Branigan's account, when he went by Goldsmith's apartment on August 2, she told him to take the gun home with him. He said that Goldsmith then drove him to the Saltzmans' apartment and that he told her that when her boyfriend got out of jail, he was going to tell him "something was going on" between her and Lafedge. It was then, according to Branigan, that Goldsmith demanded that he give the gun back but that he refused.

Branigan said that Lafedge had come to the Saltzmans' apartment looking for him, but the apartment's occupants turned him away. Branigan said that he waited for a brief time, hoping that Lafedge was gone, and then started toward his own apartment.

Branigan averred that it was then that Lafedge came up behind him with a gun and fired two shots. Branigan testified that he was in fear for his life, so he returned fire, emptying his gun.

Branigan said that he then ran from the scene because he was scared, and ended up at Rice's apartment, where he told her that he had "shot somebody [he] loved, [he] cared for, but [Lafedge] forced [him] to do it." Branigan said that

10

Rice offered to furnish him with an alibi, but he told her he did not need one. Branigan testified that the story he told Paine in the recorded interview was a fabrication.

The jury returned a verdict of guilty, and after Branigan pleaded true to the State's enhancement paragraphs, the jury assessed punishment at forty years' incarceration. The trial court entered judgment accordingly, and this appeal followed.

### III. DISCUSSION

#### A. Self-Defense

In his first issue, Branigan argues that the "evidence is legally insufficient to show [he] did not shoot Lafedge in self-defense." We disagree.

#### 1. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170.

11

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs*, 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

A defendant has the burden of producing some evidence to support a claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). After the defendant has introduced some evidence of a defense, the State bears the burden of persuasion to disprove it. *Id.*; *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991); *Dotson v. State*, 146 S.W.3d 285, 291 (Tex. App.—Fort Worth 2004, pet. ref'd). This burden does not require the State to produce evidence disproving the defense; it requires only that the State prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913; *Dotson*, 146 S.W.3d at 291. To determine the sufficiency of the evidence to disprove self-defense, the appellate court asks whether, after

12

viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt and also could have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 913–14; *Dotson*, 146 S.W.3d at 291.

## 2. Applicable Law

As charged in this case, a person commits murder if he intentionally or knowingly causes the death of a person or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of a person. Tex. Penal Code Ann. § 19.02(b)(1)–(2) (West 2011). Also as charged in this case, a person is justified in using force against another when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. *See id.* § 9.31(a) (West 2011).

## 3. Discussion

Here, the evidence is sufficient to support Branigan's murder conviction and the jury's rejection of self-defense. Viewing the evidence in the light most favorable to the verdict and resolving any conflicting inferences in favor of the prosecution, the evidence reflects that Branigan took a Hi-Point 9 millimeter handgun from Goldsmith's apartment despite her repeated protests to return it. From there, Branigan, in an agitated state of mind and specifically enraged toward Lafedge, entered the Saltzmans' apartment, where multiple people saw

13

Branigan brandish and load the gun. Testimony further revealed that Branigan was specifically angry with Lafedge regarding another man's wife and drug dealing. Witnesses testified that Branigan's presence and demeanor in the apartment, coupled with him possessing a firearm, caused them to fear giving him a ride. Thus, Branigan left on foot, where he encountered Lafedge in the parking lot and, after yelling and screaming at him, shot him. Multiple witnesses testified seeing Lafedge on the ground as Branigan continued shooting him, and multiple witnesses said that Lafedge did not have a weapon. Further, multiple witnesses testified that upon shooting Lafedge, Branigan could be heard stating things like "I got you now, mother___" and "I told you I was going to kill you." The State also introduced evidence that Lafedge may have held his hands up to defend himself against being shot at by Branigan.

Multiple witnesses also testified that after fleeing the scene of the shooting, Branigan bragged about killing Lafedge, told of disposing of the murder weapon, and attempted to fabricate an alibi. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (noting that evidence of flight evinces a consciousness of guilt); *see also Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1994) (op. on reh'g), *cert. denied*, 519 U.S. 1030 (1996) (holding that acts designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial show a consciousness of guilt).

Also, after police apprehended him, Branigan's statement was that someone else had shot Lafedge. And despite Paine giving Branigan repeated

14

opportunities to claim self-defense, Branigan maintained his statement that another person had killed Lafedge. *See Ramirez v. State*, 229 S.W.3d 725, 729 (Tex. App.—San Antonio 2007, no pet.) (op. on reh'g) (upholding a murder conviction where the defendant claimed the shooting was an accident but failed to call the police or hospital and told inconsistent stories about the incident).

Although Branigan testified that he shot Lafedge in self-defense and that Lafedge, and not "G," had come looking for him, it was for the jury to determine whether Branigan's testimony was more credible than that of other witnesses, and we are not permitted to re-evaluate the weight and credibility of the evidence. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We must presume that the jury resolved any conflicts in testimony in favor of the prosecution and defer to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793.

We hold that a rational trier of fact could have found Branigan guilty of murder beyond a reasonable doubt by choosing to believe the evidence favoring that he intentionally or knowingly caused the death of Lafedge, or that he intended to cause serious bodily injury and committed an act clearly dangerous to Lafedge's life that caused Lafedge's death, and by choosing to disbelieve the evidence favoring that he was justified in using force against Lafedge to the degree he reasonably believed immediately necessary to protect himself against Lafedge's use or attempted use of unlawful force. *See Smith v. State*, 352 S.W.3d 55, 63 (Tex. App.—Fort Worth 2011, no pet.) (holding that it was jury's

15

prerogative to resolve conflicting evidence in favor of assault conviction and not in favor of self-defense); *see also Denman v. State*, 193 S.W.3d 129, 132 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ("Because the jury, by finding appellant guilty, implicitly rejected his self-defense theory, it necessarily chose not to believe the testimony concerning such."). We overrule Branigan's first issue.

## B. Motion for Mistrial

In his second issue, Branigan argues that the trial court erred by denying his motion for mistrial. We disagree. We review a trial court's denial of a motion for mistrial under an abuse-of-discretion standard. *See Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009); *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

During the State's questioning of Branigan, the following exchange occurred:

> [Prosecutor]: So before anyone pulled a gun on you, you had a plan to shoot someone, didn't you?
>
> [Branigan]: No, ma'am.
>
> [Prosecutor]: Well, that's not what you just told this jury.
>
> [Branigan]: All right.
>
> [Prosecutor]: What you just -- you have to let me finish.
> What you just told this jury is: I heard people coming around. No one has pulled a gun on you at all at this point, and you've decided, I'm going to start loading my gun, correct?
>
> [Branigan]: Yes, ma'am.

16

[Prosecutor]: You understand that's not self-defense in any form or fashion. Do you understand that?

[Branigan]: No, ma'am.

[Defense counsel]: Your Honor, I'm going to object to that on -- on legal grounds. It doesn't even involve -- loading a gun doesn't involve self-defense in these circumstances.

THE COURT: I'm going to sustain the objection. You're --

[Defense counsel]: Ask for the jury --

THE COURT: Just a moment, Counsel. I've ruled. Rephrase your question.

[Prosecutor]: Thank you, Your Honor.

[Defense counsel]: Your Honor, if you -- if you have made a ruling, I'd ask that the jury be instructed to disregard.

THE COURT: I sustained the objection. Ladies and gentlemen, please follow my instruction that you are to disregard the last question and last response if there was one. Thank you.

[Defense counsel]: And, Your Honor, I respectfully ask for a mistrial.

THE COURT: Denied.

A mistrial is an appropriate remedy only in extreme circumstances for a narrow class of highly prejudicial and incurable errors. *Ocon*, 284 S.W.3d at 884; *Marchbanks v. State*, 341 S.W.3d 559, 561–62 (Tex. App.—Fort Worth 2011, no pet.) (explaining that a mistrial is appropriate only when "the error is so prejudicial that expenditure of further time and expense would be wasteful and futile"). Because it is an extreme remedy, a mistrial should be granted only when less drastic alternatives are insufficient to cure the harm and residual prejudice remains. *Ocon*, 284 S.W.3d at 884–85. Generally, a trial court's prompt

17

instruction is considered sufficient to cure improprieties that occur during trial, and we are to presume that a jury follows the trial court's prompt instructions. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

Branigan argues that the prosecutor's questions and commentary that Branigan's loading his gun was inconsistent with self-defense left the jury with an improper understanding of the law regarding self-defense and that the trial court's instruction to disregard did not cure this misperception. Branigan attempts to buttress his argument by pointing out the State's later questioning of Branigan as to why he had changed his testimony regarding his reasoning for loading the gun and the State's closing argument wherein the prosecutor points to this inconsistent testimony.

First, Branigan did not object to the State's questioning him about his changing testimony or to the State's closing argument; thus, to the extent that Branigan is now appealing the State's questioning regarding his vacillating testimony as to why he loaded the gun, he has failed to preserve this issue for our review. *See Habib v. State*, 431 S.W.3d 737, 740–41 (Tex. App.—Amarillo 2014, pet. ref'd) (holding that appellant failed to preserve denial of closing argument issue for appeal because "appellant did not voice an objection [during] closing argument").

Further, even assuming that the prosecutor's question and statement that loading a gun is inconsistent with the legal definition of self-defense, Branigan has not persuaded this court that we should fail to abide by the presumption that

18

the jury followed the court's prompt instruction to disregard the State's question. *Gamboa*, 296 S.W.3d at 580. Moreover, as the State points out, the trial court correctly instructed the jury on self-defense in the jury charge, and the jury is presumed to have followed the court's instructions. *See Taylor v. State*, No. 02-02-000125-CR, 2003 WL 21197542, at *3 (Tex. App.—Fort Worth May 22, 2003, no pet.) (mem. op., not designated for publication), citing *Gardner v. State*, 730 S.W.2d 675, 696–97 (Tex. Crim. App.), *cert. denied*, 484 U.S. 905 (1987)). We overrule Branigan's second issue.

## IV. Conclusion

Having overruled both of Branigan's issues on appeal, we affirm the trial court's judgment.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 4, 2015

Mark Branigan
Clements Unit 1887004
9601 Spur 591
Amarillo, TX 79107-9696

Texas Court of Criminal Appeals

ATTN: CLERK

Supreme Court Building
201 West 14th St.
Capital Station
Austin, TX 78711

